ROEBLING SECURITIES CORPORA-
TION, a New Jersey corporation in
dissolution, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 869–57.

United States District Court
D. New Jersey.

Aug. 21, 1959.

Wharton, Stewart & Davis, Somerville, N. J., by T. Girard Wharton, John W. Fritz and Richard H. Herold, Somerville, N. J., for plaintiff.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by John D. Wooley, Trenton, N. J., and Benjamin H. Pester, Atty., Dept. of Justice, Washington, D. C., for defendant.

FORMAN, Chief Judge.

The Roebling Securities Corporation, a New Jersey corporation in dissolution, has moved for summary judgment pursuant to Rule 56, F.R.C.P. in this action brought under 28 U.S.C. §§ 1340 and 1346(a) (1) (1952 ed.) to recover taxes and interest of $190,404.11 and $21,420.46 respectively, assessed and collected by the Government for the calendar year 1954.

The Government moves "for partial summary judgment * * * concerning the matters set forth in paragraphs 7 through 12 of the Amended Complaint

"7. Prior to the end of 1952, plaintiff was engaged in the manufacture and sale of steel and copper wire and wire products and in related business activities. On December 8, 1952, plaintiff entered into agreements with Colorado Fuel & Iron Corporation (hereinafter called CF&I) and Colorado Steel Corporation, a wholly-owned subsidiary of CF&I (hereinafter called the Subsidiary) pursuant to which plaintiff agreed (a) to sell its operating assets to the Subsidiary in exchange for $23,000,000 (subject to minor adjustments) and the assumption of certain of plaintiff's liabilities, and agreed (b) to purchase from CF&I 200,-000 shares of 5½% cumulative preferred stock, Series B, of CF&I for $10,000,000. Each of the above two agreements was conditioned upon the simultaneous consummation of the other agreement.

"8. The above agreements were consummated simultaneously at a closing on December 31, 1952. In accordance with the agreements, plaintiff received from the Subsidiary checks for $13,000,000 and $10,000,000, and immediately endorsed and delivered the latter check to CF&I in exchange for 200,000 shares of 5½% cumulative preferred stock, Series B, of CF&I. Plaintiff left the closing with $13,000,000 and 200,000 shares of such preferred stock, which was all that plaintiff was entitled to receive under the agreements.

"9. The aforesaid 200,000 shares of preferred stock had a fair market val-

* * *." [1] and for an order directing Roebling to produce:

"1. All correspondence had between [Roebling] and Curzen Dobell pertaining to the sale by [Roebling] on January 21, 1955 to Curzon (sic) Dobell of all its claims against Preload Inc., and all of the Preload Inc. stock which it owned, for an aggregate price of $200,000.

"2. All documents and records pertaining to the sale transactions set out in the preceding paragraph."

Roebling's motion will be considered first. It involves only one phase of the case which if decided in Roebling's favor would dispose of the entire suit.

The following pertinent facts inter alia have been stipulated:

1. Prior to the end of 1952 plaintiff engaged in the manufacture and sale of

ue on December 31, 1952, of not more than $7,400,000.

"10. Plaintiff realized a loss on the above described sale of its operating assets. In determining the amount of such loss for federal income tax purposes, defendant has computed such loss as though plaintiff had received for its assets the $10,000,000 which it was required to pay to CF&I having a market value not in excess of $7,400,000 into which plaintiff was required to convert said $10,000,000.

"11. In determining the amount of the loss realized by plaintiff for federal income tax purposes on the sale of its operating assets as above described, plaintiff should be treated as having received in exchange for such assets the 200,000 shares of preferred stock of CF&I rather than the $10,000,000 which plaintiff was required to convert into such shares of preferred stock. On that basis, plaintiff had a net operating loss carry-over from 1952 to 1954 and, under Section 23(s) and Section 122 of the Internal Revenue Code of 1939 [26 U.S.C. §§ 23(s), 122], plaintiff was entitled to a net operating loss deduction for 1954 of at least $2,668,510.46.

"12. The allowance to plaintiff of a net operating loss deduction for 1954 in the amount of $2,668,510.46 last above would eliminate any liability of plaintiff for federal income tax for the calendar year 1954." Amended Complaint.

steel and copper wire and wire products and related business activities. On December 31, 1952, its corporate name was changed from John A. Roebling's Sons Company to The Roebling Securities Corporation.

2. On December 8, 1952, plaintiff entered into two agreements: one with the Colorado Fuel & Iron Corporation, (hereafter referred to as CF&I), and the other with the latter's subsidiary, the Colorado Steel Corporation, (hereafter referred to as Steel).

3. The agreement with Steel was for the sale of plaintiff's operating assets for $23,000,000, subject to certain adjustments [2] and the assumption of certain of plaintiff's liabilities.[3]

4. In the agreement with CF&I, plaintiff agreed to purchase from it 200,000 shares of $5\frac{1}{2}\%$ cumulative preferred stock, which constituted the entire Series B issue, for $10,000,000.

5. Each agreement was expressly conditioned upon the simultaneous consummation of the other and each provided that if, for any reason, the other was not consummated the obligations of each

party therein would cease and determine without liability on the part of either party to the other.[4]

6. These agreements were consummated simultaneously at a closing held on December 31, 1952, which occurred in the following steps:

(a) Steel paid plaintiff $10,000,000.

(b) Plaintiff paid $10,000,000 to CF&I for the issuance to it of the 200,000 shares of Series B preferred stock.

(c) CF&I paid to Steel $14,999,000.

(d) Steel paid plaintiff $13,000,000 of the $14,999,000 it had received from CF&I.

7. As of December 31, 1952 CF&I had issued and outstanding 2,478,684.25 shares of common stock of no par value; 47,521 shares of 5% preferred stock, Series A, of the par value of $50 a share; and 200,000 shares of $5\frac{1}{2}\%$ preferred stock, Series B, of the par value of $50 a share, which entire issue was conveyed to the plaintiff on that date as stated above.

8. At the time of the closing, the 5% preferred stock, Series A, of CF&I was not listed on any stock exchange but was traded in the Over-the-Counter Market.

---

2. On May 11, 1953, plaintiff paid Steel $1,890,648.20 in reduction of the selling price pursuant to the Roebling-Steel agreement. For purposes of this opinion, however, this aspect of the sale need not be referred to.

3 Specifically the agreement provides: "Purchase Price. The aggregate purchase price for the assets and business [of Roebling] is $23,000,000 * * * made up as follows:

Inventories ...............$17,500,000
Land, Buildings and Building Equipment, Machinery and Equipment, Construction in Progress .... 5,499,999
All intangible assets ...... 1
  Total ............$23,000,000"

4. " * * * Notwithstanding anything to the contrary herein contained, this agreement and the performance thereof and all obligations of the Seller and Purchaser hereunder are expressly conditioned upon the simultaneous consummation of the transactions contemplated by the aforesaid contract between said Colorado Steel Corporation and the Purchaser herein.

If for any reason such transactions shall not be so consummated then all obligations of each party hereunder shall cease and determine without liability on the part of either party to the other, and this agreement shall be of no force and effect." Paragraph 9(b) of Agreement between The Colorado Fuel and Iron Corporation and John A. Roebling's Sons Company. Exhibit P–4 to the stipulation.

" * * * Notwithstanding anything to the contrary herein contained, this Agreement and the performance thereof and all obligations of the parties hereunder are expressly conditioned upon the simultaneous consummation of the stock purchase contemplated by the aforesaid contract between Roebling and the Corporation. If for any reason such stock purchase shall not be so consummated then all obligations of each party hereunder shall cease and determine without liability on the part of either party to the other, and this Agreement shall be of no force and effect." Paragraph 22 of Agreement between Colorado Steel Corporation and John A. Roebling's Sons Company. Exhibit P–5 to the stipulation.

At the end of December, 1952, CF&I Series A preferred stock was quoted at $40 bid and $43 asked. At the end of each of the last four months of 1952 and the first four months of 1953 this same issue was quoted as follows:

|  | Bid | Asked |
|---|---|---|
| September, 1952 | 42 | 44 |
| October, 1952 | 41 | 43 |
| November, 1952 | 41 | 43 |
| December, 1952 | 40 | 43 |
| January, 1953 | 40 | 42 |
| February, 1953 | 38 | 41 |
| March, 1953 | 38 | 42 |
| April, 1953 | 38 | 41 |

9. On March 31, 1954, plaintiff distributed the 200,000 shares of CF&I Series B stock to its shareholders. Immediately thereafter 153,187 of those shares were sold through a New York broker for $42.50 per share, less selling expenses of $3.08 per share, leaving a net price of $39.42. Said stock was first sold on an exchange on May 24, 1954, when 500 shares were sold at a high of $43.25 and a low of $43.

10. At the end of March, 1954, the bid and asked prices per share of the CF&I Series A stock were $41 and $43, respectively.

11. On March 12, 1954, plaintiff was issued a certificate of dissolution by the Secretary of State of New Jersey, but continued to exist for the purposes of prosecuting suits and of settling its affairs as provided by the law of New Jersey.

12. Plaintiff reported no tax liability for 1954 in its income tax return for that calendar year.

13. Plaintiff realized a loss on the sale of its assets to Steel in 1952. In assessing a deficiency of $190,404.11 in plaintiff's 1954 federal income tax, defendant computed such loss as though plaintiff had received for such assets the sum of $23,000,000 (reduced by the aforesaid adjustment of $1,890,648.20 repaid by plaintiff to Steel on May 11, 1953.)[5]

14. Plaintiff paid this alleged deficiency plus interest on January 31, 1957 to the District Director of Internal Revenue, Camden, New Jersey.

15. On March 14, 1957, plaintiff properly filed a timely claim for refund of its payment in the sum of $211,824.57, together with interest.

16. On July 30, 1957, plaintiff was notified of the disallowance in full of this claim. It has not received any refund or credit therefor.

Based on the foregoing the Government contends that the plaintiff engaged in two separate arms-length transactions; and that in one it sold its assets for $23,000,000 and in the other used $10,000,000 of the former amount to purchase the CF&I Series B issue.

Plaintiff urges that it could not have left the closing on December 31, 1952 with $23,000,000 in cash, because the very terms of the agreements bound it to leave with $13,000,000 and the Series B issue which it says had a value of not more than $9,434,721.23.

■■ The law is clear that in matters of taxation it is the substance and not the form of the transaction to which the court must look. Weiss v. Stearn, 1924, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, Commissioner of Internal Revenue v. Moore, 10 Cir., 1931, 48 F.2d 526, Commissioner of Internal Revenue v. Court Holding Company, 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, Jacobs v. Com'r., 9 Cir., 1955, 224 F.2d 412, Kanawha Gas & Utilities Co. v. Com'r., 5 Cir., 1954, 214 F.2d 685. Equally well settled is the proposition that a unitary transaction may not be separated or "atomized" into its components by either the taxpayer or the Government for purposes of taxation. Helvering v. New Haven & Shore Line R. Co., 2 Cir., 1941, 121 F.2d 985, certiorari denied 1942, 315 U.S. 803, 62 S.Ct. 631, 86 L.Ed. 1203, Hazeltine Corp. v. Com'r., 3 Cir., 1937, 89 F.2d 513, Ashland Oil & Refining Co. v. Com'r., 6

5. Plaintiff's claim in 1954 for its loss in 1952 is based on Section 172 of the Internal Revenue Code of 1954, 26 U.S.C. § 172.

Cir., 1938, 99 F.2d 588, certiorari denied 1939, 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1057, Morgan v. Helvering, 2 Cir., 1941, 117 F.2d 334, Budd International Corp. v. Com'r., 3 Cir., 1943, 143 F.2d 784, certiorari denied 1945, 323 U.S. 802, 65 S.Ct. 562, 89 L.Ed. 640, Barker v. United States, 9 Cir., 1952, 200 F.2d 223, May Broadcasting Co. v. United States, 8 Cir., 1953, 200 F.2d 852, Kanawha Gas & Utilities v. Com'r., supra, Commissioner of Internal Revenue v. Moore, supra. All of these cases are concerned with corporate reorganizations including Moore, Barker, Hazeltine and May which alone specifically share the common fact of two contracts with the matter at hand. But this distinction is not critical for I see no reason why the legal principle involved should be less applicable to the instant matter than to a corporate reorganization.

The question therefore is whether or not plaintiff's sale of its assets to Steel and its purchase of CF&I's Series B issue were two transactions, or two steps in one transaction. In Morgan v. Helvering, supra, the court noted in affirming the finding of a single transaction that each party which performed its part could have compelled the other to perform. In the instant case the agreements provided an equal compulsion to the opposite end in that if either contract was not consummated, the other became of "no force and effect." Reading both agreements together as must be done because each is expressly conditioned upon the other's simultaneous consummation, it is apparent that the sale of plaintiff's assets would not have occurred without the contemporaneous purchase by plaintiff of the CF&I Series B issue. Such was the clear intent of the parties and is not to be overlooked. Von's Investment Co. Ltd. v. Com'r., 9 Cir., 1937, 92 F.2d 861, 863.

I am constrained to find that plaintiff CF&I and Steel engaged in and consummated a single transaction—indivisible for purposes of taxation, and I therefore conclude that plaintiff sold its assets to Steel for $13,000,000 and the CF&I issue of Series B preferred stock comprised of 200,000 shares.

It now becomes necessary to determine the value of the Series B preferred shares as of the day of their acquisition by plaintiff for its tax liability decreases with any diminution of the $50 value per share upon which the tax was based. Indeed plaintiff contends that the entire amount of tax and interest is extinguished if the valuation of the issue is brought down to, or under, $9,434,721.-23 or 47.17 per share.

Plaintiff argues that since Series B was a new issue, its fair market value is to be obtained by comparing it to the CF&I Series A preferred stock. Plaintiff notes that Series A shares with a dividend rate of 5% as opposed to 5½% on Series B, had a market value of $41.50 on December 31, 1952. Absent other factors, contends the plaintiff, this would place the value of Series B shares at $45.65, based on the difference in dividend rates. But, says the plaintiff, other factors were present viz. Series A had superior sinking fund provisions and general voting rights which Series B did not have. Furthermore, argues plaintiff, a bloc of 200,000 shares could have been sold only at a substantial discount from the quoted market value. The necessary conclusion from the foregoing, according to plaintiff, is that the 200,000 shares of CF&I Series B had a fair market value on December 31, 1952, of not more than $45.65 per share, substantially below the $47.17 maximum value per share which permits it to recover the full amount of taxes and interest paid for the calendar year 1954.

The Government contends that the fair market value of the stock was precisely what plaintiff paid for it, i. e. $10,000,000 or $50 per share. To support its position the Government cites Budd International Corporation v. Com'r., 3 Cir., 1943, 143 F.2d 784, Champlin Refining Co. v. Com'r., 10 Cir., 1941, 123 F.2d 202 and Philadelphia Park Amusement Co. v. United States, 1954, 126 F.Supp. 184, 130 Ct.Cl. 166, for the proposition that the value of the Series B stock is the value of what the plaintiff gave in exchange therefor. These cases were all

concerned with the following language of § 113(a) of the 1939 Code, 26 U.S.C. § 113(a): "The basis of property shall be the cost of such property." In Budd and Champlin it was held that the cost in a taxable exchange is the fair market value of the property given in the exchange. In Philadelphia Park the court held that the cost of the property received is its own fair market value.

The case at bar, however, is concerned not with § 113(a) but with § 111 of the 1939 Code, 26 U.S.C. § 111, which reads in pertinent part as follows:

"Determination of amount of, and recognition of, gain or loss

"(a) Computation of gain or loss. The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

"(b) Amount realized. The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

It is obvious that the problem or choice of interpretation presented by § 113(a) does not arise under § 111 which provides that the value of the property received, other than money, is its fair market value.

The Government further contends that since the Steel agreement sets out a consideration of $23,000,000, plaintiff should not be permitted to change that provision to $13,000,000 and 200,000 shares of CF&I Series B preferred stock worth less than $10,000,000. It notes that in Commissioner of Internal Revenue v. Moore, 10 Cir., 1931, 48 F.2d 526, certiorari denied 1931, 284 U.S. 620, 52 S.Ct. 8, 76 L.Ed. 528, upon which plaintiff places great emphasis, the court read both agreements together but found that the

sale at issue was at a fixed price. In that case the taxpayer undertook to sell 200 shares of Garfield Oil Co. (half the issue) to the Exchange Oil Co. which held the other 200 shares. Exchange was a subsidiary of Sinclair Oil Co. Two agreements were drawn. One was between the taxpayer and Exchange and provided for a purchase price of $3,000,000 of which $500,000 was to be paid in cash and the balance by assigning 20% of Exchange's gross income to the taxpayer until liquidated. The other contract was between the taxpayer and the Sinclair Oil Co. In it the taxpayer purported to grant Sinclair an option to buy stock for $2,500,000. This stock endorsed in blank was to be delivered to a trustee named in the contract. Taxpayer was to get income from the oil and gas certificates until the $2,500,000 was liquidated, when ownership would pass to Sinclair. If income did not equal $500,000 in any given year, Sinclair guaranteed the difference without interest and also promised to purchase the certificates five years from the date of the contract for $2,500,000. The court held that this was not an option but a contract. The precise issue of the case was in what year the profit on the sale of the Garfield stock was to be reported by the taxpayer.

The Government contends that in Moore the court did not alter the stated consideration of $3,000,000, whereas the instant plaintiff desires that this court find an ultimate consideration other than that stated in its contract with Steel. In considering this contention, the main point of Moore should not be lost sight of i. e. that both contracts were to be read together. Furthermore, in that case, the court did not have before it the peculiar fact situation of the instant case. Thus in Moore there were two contracts both of which for the purposes of that litigation provided for an identical consideration of $2,500,000. In this case, however, one agreement, Roebling-Steel, provided for a consideration of $23,000,000 for the sale of Roebling's operating assets to Steel, while the other agreement, Roebling-CF&I, provided for a consideration

of $10,000,000 for the purchase by Roebling of CF&I's Series B issue. I cannot agree with the Government's contention that by virtue of Moore the price stated in the Roebling-Steel agreement must control when there are present in the case two agreements which must be read as one. To do so, would be to follow mere formalisms, a path condemned in Commissioner of Internal Revenue v. Court Holding Co., supra, and to ignore the intent of the parties. Von's Investment Co., Ltd. v. Com'r., supra.

While I cannot agree with the Government that the fair market value of the Series B stock was $10,000,000, I am similarly unable to find for the plaintiff because the Government has raised a fact question as to this issue. Krieger v. Ownership Corp., 3 Cir., 1959, 270 F.2d 265, Lawlor v. National Screen Service Corporation, 3 Cir., 1956, 238 F.2d 59, at page 65, reversed on other grounds, 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540, and Frederick Hart & Co. v. Recordgraph Corp., 3 Cir., 1948, 169 F.2d 580.

Accordingly plaintiff's motion for summary judgment will be granted to the extent that I find it sold its assets to Steel for $13,000,000 plus the CF&I Series B issue of 200,000 shares. The Government's cross-motion for summary judgment will be denied at this time to await the outcome of a hearing on the question of value of the Series B issue which hearing will be listed in the next calendar of non-jury cases.

It should be noted that the amended complaint sets forth an additional right to recovery which may be referred to as the Preload issue, a complicated matter completely unrelated to the CF&I-Steel question, either of which, however, if resolved in plaintiff's favor, would result in complete recovery of the 1954 tax. For that reason the Preload issue is moot if Roebling prevails on the CF&I-Steel question. On the other hand, should plaintiff lose the CF&I-Steel issue here, it will be necessary to entertain its proofs on Preload.

If plaintiff prevails here, an appeal by the Government from such a decision, though interlocutory, in view of the untouched Preload phase, should be cognizable under the provisions of 28 U.S.C. § 1292(b) (1952 ed.)

The Government's remaining motion, for an order directing plaintiff to produce certain correspondence and documents as set out above, was supported by neither brief nor argument. On May 26, 1959, 21 days before the oral argument, plaintiff submitted a statement in lieu of brief opposing the motion on the following grounds:

"(a) the Government has not complied with Rule 7(b)(1) of the Federal Rules of Civil Procedure requiring that, 'An application to the court for an order shall be by motion which * * * shall state with particularity the grounds therefor * * *,'.

"(b) the Government's motion does not set forth the 'good cause' which would remove its application from the requirement of the District's Rule 19 that all discovery proceedings be completed within 90 days of the date of issue joined;

"(c) the Government has failed to implement its motion by way of the brief or statement required by District Rule 10."

As to ground (b), I note that the amended complaint and answer were filed on April 27, 1959 and May 13, 1959 respectively. Ground (b) is therefore without merit.

Although I might well be persuaded to suspend the application of Rule 10 of this court despite the fact that the Government had time in which to comply therewith, a more serious deficiency is found in the Government's failure to meet the requirements of Rule 7(b)(1), F.R.C.P. as set out in ground (a). I therefore deny the Government's motion for an order directing plaintiff to produce certain correspondence and documents without prejudice to a renewal of the application in conformity with the statute and rules.

An order should be submitted in conformity herewith.