399 F.2d 652
 REDWING CARRIERS, INC., and Rockana Carriers, Inc., by Redwing Carriers, Inc., Appellants,
v.
Laurie W. TOMLINSON, former Director of Internal Revenue for the District of Florida, Appellee.
 No. 24785.
 United States Court of Appeals Fifth Circuit.
 August 22, 1968.
 
 COPYRIGHT MATERIAL OMITTED Michael G. Emmanuel, Norman H. Lipoff, Thomas D. Aitken, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for appellants.
 Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli, Robert N. Anderson, Robert H. Solomon, Issie L. Jenkins, Bennet N. Hollander, Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., E. J. Salcines, Asst. U. S. Atty., Tampa, Fla., for appellee.
 Before BELL, GOLDBERG and DYER, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This case involves another attempt by a taxpayer to insulate himself from the incidence of taxation by means of paper armor. The question presented is whether a taxpayer may shape what is essentially an integrated purchase and trade-in transaction of new and used trucks into two separate transactions in order to recognize an immediate gain at capital gains rates and concomitantly to take a larger depreciation deduction from ordinary income. We agree with the district court that this transaction is an exchange rather than two sales, and thus comes within the coverage of Section 1031 of the Internal Revenue Code.[1]
 
 
 2
 This appeal involves income tax liabilities for the calendar years 1958 through 1961 in the total amount of $66,630.33. The plaintiff below and appellant here, Redwing Carriers, Inc.,[2] paid the assessments in question and sued in the district court for a refund with interest.
 
 
 3
 The following facts were substantially stipulated, and the district court's findings on the few disputed fact questions were not clearly erroneous.[3] Redwing is a Florida corporation engaged in the business of hauling bulk commodities as a common carrier, subject to regulation by the Interstate Commerce Commission. Trucksales, Inc., a Florida corporation engaged in the business of selling trucks, parts and equipment, is a wholly-owned subsidiary of Redwing. During the years in question Trucksales was a franchised dealer for G. M. C. trucks. Charles E. Mendez, as president and chairman of the board of both Redwing and Trucksales, was the moving force behind the transactions in question.
 
 
 4
 During 1958 Trucksales purchased twenty-eight new G. M. C. diesel tractor trucks from G. M. C. for cash. At or about the same time Redwing transferred title to twenty-seven used trucks to G. M. C. for cash. In 1959 and 1961 essentially identical transactions involving thirty-six and fourteen trucks, respectively, were executed. Also during 1959 transactions in like form were executed with White Motor Company.
 
 
 5
 Because it is an extremely profitable trucking concern, Redwing is considered a prestige account by both G. M. C. and White Motor Company. Thus Mendez, who handled all negotiations in these transactions, was in a strong bargaining position and was able to insist upon casting these purchases of new equipment and trade-ins in the form of separate purchases of the new and sales of the old.
 
 
 6
 Mendez did not specify which corporation he was representing at any time to either White or G. M. C., and it made no difference to the manufacturers whether they were dealing with Redwing or with Trucksales. Both Redwing and Trucksales used the same Tampa address on the checks used in these transactions, even though Trucksales is located in Fort Lauderdale and even though it used a Fort Lauderdale bank account for all of its other business activities. Most of the trucks involved were delivered by White and G. M. C. directly to Redwing in Tampa, despite the fact that they were ostensibly being sold to Trucksales in Fort Lauderdale for resale to Redwing.
 
 
 7
 In addition to the above indicia of transactional unity, the district court found a definite contractual interdependency between the sale of new trucks and the trade-in of old trucks. In its findings of fact the court noted: "There would have been no purchase by plaintiffs of new trucks or tractors without concurrent and binding agreements to purchase plaintiff's used equipment."[4]
 
 
 8
 The district court further found that G. M. C. viewed these transactions as trade-ins which were occasioned by the purchase of new equipment and that the form of selling the old and purchasing the new was arranged solely on Mendez' insistence. A G. M. C. executive testified that the price which G. M. C. paid for the used trucks was in excess of their fair market value and that G. M. C. would be able to calculate a profit only by viewing the purchases of used trucks and sales of new trucks as one transaction.[5]
 
 
 9
 It is apparent that Mendez sculptured these transactions so as to achieve the best possible tax results for Redwing. Instead of obtaining customary discounts from the retail price of the new trucks, Mendez would insist that the manufacturers add the discount amount to the price of the used trucks being repurchased. The gain of the trade-in price over the depreciated basis of the used trucks would be recognized at capital gains rates, and the basis of the new trucks for depreciation purposes would be inflated. As a result, Redwing's depreciation deductions from ordinary income would also be inflated, resulting in considerable tax savings.[6]
 
 
 10
 As is obvious from the above facts, these Mendez-dominated transactions were severable in form only. In substance, the sale was in bondage to the purchase and the purchase indissolubly dependent upon the sale. If Redwing had not carried out the agreement to buy the new trucks, the auto makers would have had no juristic obligation to purchase the used trucks. The buying and selling were synchronous parts meshed into the same transaction and not independent transactions.
 
 
 11
 Section 1031 requires the non-recognition of gain or loss in transactions when in theory the taxpayer may have realized gain or loss, but in substance his economic interest in the property has remained virtually unchanged by the transaction. Century Electric Co. v. Commissioner of Internal Revenue, 8 Cir. 1951, 192 F.2d 155, 159, cert. den., 342 U.S. 954, 72 S.Ct. 625, 96 L.Ed. 708. Compare Trenton Cotton Oil Co. v. Commissioner of Internal Revenue, 6 Cir. 1945, 147 F.2d 33, 36.[7] With its paper armor crumpled, Redwing's transactions are brought directly within the ambit of Section 1031, and, more specifically, within that of Treas. Reg. § 1.1031(a)-1(c):
 
 
 12
 "(c) No gain or loss is recognized if (1) a taxpayer exchanges property held for productive use in his trade or business, together with cash for other property of like kind for the same use such as a truck for a new truck or a passenger automobile for a new passenger automobile to be used for a like purpose; * * *"
 
 
 13
 Because of the expertise of Internal Revenue Service in interpreting the Internal Revenue Code which it is charged with administering, Treasury regulations come to us with great persuasive force. South Texas Land Co. v. C. I. R., 1947, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831, 836; United States v. D. I. Operating Co., 9 Cir. 1966, 362 F.2d 305, 308, cert. den., 385 U.S. 1024, 87 S.Ct. 742, 17 L.Ed.2d 673; cf. Estate of Willett v. C. I. R., 5 Cir. 1966, 365 F.2d 760; Whirlwind Mfg. Co. v. United States, 5 Cir. 1965, 344 F.2d 153. When, as here, the regulation has long continued without substantial change, applying to unamended or substantially reenacted statutes, the regulation is deemed to have the effect of law. United States v. Correll, 1967, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537, 543; Fribourg Nav. Co. v. Commissioner, 1966, 383 U.S. 272, 283, 86 S.Ct. 862, 868, 15 L.Ed.2d 751, 758. In Vitter v. United States, 5 Cir. 1960, 279 F.2d 445, cert. den., 364 U.S. 928, 81 S.Ct. 353, 5 L.Ed.2d 266, Judge Brown, speaking for our Court, articulated this rule of construction as follows:
 
 
 14
 "When a Treasury Regulation interprets a section of the Code and the Regulation remains in effect and unchanged for a long period of time, re-enactment of the statute without change is presumed to show congressional approval of the Regulation which thereby acquires the force and effect of law * * * [numerous cases cited]." 279 F.2d at 450 [at fn. 9].
 
 
 15
 The relevant part of Treas.Reg. § 1.1031(a)-1(c), as well as Section 1031 (a) of the Internal Revenue Code, is identical to its predecessor under the 1939 Code.[8] Despite extensive changes in the Internal Revenue Code in 1954, no change was made in what is now § 1031(a). Further amendments were made to other parts of § 1031 in 1958 and 1959, but § 1031(a) was left untouched. It is reasonable to assume, therefore, that Congress knew and approved of the application of § 1031(a) to trade-ins of trucks.
 
 
 16
 The Treasury's interpretation of § 1031(a) was also manifested in Revenue Ruling 61-119, 1961-1 Cum.Bull. 395. This Ruling bears directly on the exact question at bar:
 
 
 17
 "Where a taxpayer sells old equipment used in his trade or business to a dealer and purchases new equipment of like kind from the dealer under circumstances which indicate that the sale and the purchase are reciprocal and mutually dependent transactions, the sale and purchase is an exchange of property within the meaning of section 1031 of the Internal Revenue Code of 1954, even though the sale and purchase are accomplished by separately executed contracts and are treated as unrelated transactions by the taxpayer and the dealer for record keeping purposes."
 
 
 18
 The district court in its conclusions of law relied heavily on that Ruling, and we agree. Although the Ruling does not have the force and effect of law, we find it to be a persuasive interpretation of the Code and Regulations. See 3 Mertens, Federal Income Taxation §§ 20.31 and 20.165 (at p. 724).
 
 
 19
 Despite Redwing's arguments to the contrary, Revenue Ruling 61-119 is founded upon well established principles of tax law. Both the Supreme Court and our Court have on numerous occasions stated that when the realities of a transaction differ from its paper shell, the Internal Revenue Service and the courts may open the shell and look inside to determine the substance of the transaction. Commissioner of Internal Revenue v. Court Holding Co., 1944, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981, 985; Higgins v. Smith, 1939, 308 U.S. 473, 477, 60 S.Ct. 209, 355, 84 L.Ed. 406, 411; Helvering v. F & R Lazarus Co., 1939, 308 U.S. 252, 256, 60 S.Ct. 209, 211, 84 L.Ed. 226, 230; Gregory v. Helvering, 1934, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; United States v. Henderson, 5 Cir. 1967, 375 F.2d 36, 40, cert. den., 389 U.S. 953, 87 S.Ct. 1017, 18 L.Ed.2d 101; Kinney v. United States, 5 Cir. 1966, 358 F.2d 738, 739; Willow Terrace Development Co. v. Commissioner of Internal Revenue, 5 Cir. 1965, 345 F.2d 933, 936, cert. den., 382 U.S. 938, 86 S.Ct. 389, 15 L.Ed.2d 349; Cobb v. Callan Court Co., 5 Cir. 1960, 274 F.2d 532, 539. See also Coastal Terminals, Inc. v. United States, D.C. S.C.1962, 207 F.Supp. 560, 562, aff'd 320 F.2d 333, wherein this rule was applied in a Section 1031 case.
 
 
 20
 In Blackstone Realty Co. v. Commissioner of Internal Revenue, 5 Cir. 1968, 398 F.2d 991, 996, [July 12, 1968], we said:
 
 
 21
 "[O]ur income tax law is premised on fact and not fiction. A transaction is analyzed for its pragmatic realities. Although a taxpayer is free to negotiate a contract with an intent to avoid or minimize taxes, such benefit cannot be awarded to Blackstone Realty in the absence of negotiations for prices and values. The intention to avoid or minimize taxes, beneficent as it is, cannot be employed where the end product is a mere subterfuge. Martin v. Commissioner of Internal Revenue, 6 Cir. 1967, 294 F.2d 282; MacRae v. Commissioner of Internal Revenue, 9 Cir. 1961, 294 F.2d 56, cert. den., 1962, 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388; Trousdale v. Commissioner of Internal Revenue, 9 Cir. 1955, 219 F.2d 563. Cf. Reef Corporation v. Commissioner of Internal Revenue, 5 Cir. 1966, 368 F.2d 125, cert. den., 1967, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454; General Guaranty Mortgage Co., Inc. v. Tomlinson, 5 Cir. 1964, 335 F.2d 518."
 
 
 22
 See also, Commissioner of Internal Revenue v. Tower, 1945, 327 U.S. 280, 288-289, 66 S.Ct. 532, 536, 90 L.Ed. 670, 676-677; Particelli v. Commissioner of Internal Revenue, 9 Cir. 1954, 212 F.2d 498, 500; Gyro Engineering Corp. v. United States, 1967, C.D.Calif., 276 F. Supp. 454, 465.
 
 
 23
 Equally well established is the corollary that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer. Roebling Securities Corp. v. United States, 1959, D.C.N.J., 176 F. Supp. 844, 847. In Kanawha Gas & Utilities Co. v. Commissioner of Internal Revenue, 5 Cir. 1954, 214 F.2d 685, 691, our Court through Judge Rives said:
 
 
 24
 "In determining the incidence of taxation, we must look through form and search out the substance of a transaction. * * * [cases cited] This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated."
 
 
 25
 See also Jacobs v. Commissioner of Internal Revenue, 9 Cir. 1955, 224 F.2d 412; Century Electric Co. v. Commissioner of Internal Revenue, 8 Cir. 1951, 192 F.2d 155, cert. den., 342 U.S. 954, 72 S.Ct. 625, 96 L.Ed. 708; Mather v. Commissioner of Internal Revenue, 6 Cir. 1945, 149 F.2d 393; Commissioner of Internal Revenue v. Ashland Oil & Refining, 6 Cir. 1938, 99 F.2d 588, 591, cert. den., 1939, 308 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057; Kinney v. United States, W.D.La.1964, 228 F.Supp. 656, 661, aff'd 5 Cir. 1966, 358 F.2d 738.
 
 
 26
 The above cases show quite clearly that a tax-free exchange cannot be transformed into two sales by the arbitrary separation of time and exchange of cash. See Commissioner of Internal Revenue v. North Shore Bus Co., 2 Cir. 1944, 143 F.2d 114, which held that a trade-in of used busses in connection with a purchase of new ones was an exchange governed by the predecessor of Section 1031 despite the taxpayer's receipt of cash from the seller in order to pay off the mortgage on the used busses. See also National Outdoor Advertising Bureau v. Helvering, 2 Cir. 1937, 89 F.2d 878, 890, reversing on other grounds, 1935, 32 B.T.A. 1025; Graves, Cox and Co., 1933, 27 B.T.A. 546; Joseph J. Vidmar, 1952, 11 CCH Tax Ct.Mem. 854.
 
 
 27
 The appellant attempts to bolster its defenses, however, with a decision from our Court, Carlton v. United States, 5 Cir. 1967, 385 F.2d 238. In that case the taxpayer had sold ranch property to a purchasing corporation for cash. As part of this sale, the purchaser had assigned to the taxpayer contracts to purchase two similar tracts of land, which purchases the taxpayer had immediately consummated. Although it was stipulated that both the taxpayer and the purchaser had intended to effect an exchange — indeed that they had performed the three-way transaction merely to avoid unnecessary duplication in title transfer — we refused to accept the taxpayer's classification of the overall transaction as a tax-free exchange under Section 1031.
 
 
 28
 The appellant would have us follow Carlton here as if that case had ignored transactional substance and instead had viewed the whole only as an aggregate of separate, unrelated transfers. On the contrary, in that case we gave weight to the various individual transfers only because they were separate and unrelated. In Carlton we were reviewing a three-way transaction in which the taxpayer had received, in return for property, cash which was not restricted in use to the purchase of like property. The most that could be said for the transactional relationship in Carlton was that the sale for cash between the taxpayer and a purchaser had been complementary with the later purchase of like property between the taxpayer and a seller. In the case at bar, however, there were only two parties to each exchange of trucks (ignoring intracorporate fictional distinctions), and the alleged "sale" and "trade-in sales," instead of being separate, were related by contractual interdependency.
 
 
 29
 In Carlton both the transfers of land and the interparty obligations were severable and, in fact, severed. Here we find, as did the district court, the same transactional twining from beginning to end. Carlton, then, is clearly distinguishable and certainly does not stand as an obstacle to the pertinent tax considerations which we have discussed supra.[9]
 
 
 30
 Taxation is transactional and not cuneiform. Our tax laws are not so supple that scraps of paper, regardless of their calligraphy, can transmute trade-ins into sales. Although Redwing's transfers may have been paper sales, they were actual exchanges. A taxpayer may engineer his transactions to minimize taxes, but he cannot make a transaction appear to be what it is not. Documents record transactions, but they do not always become the sole criteria for transactional analysis.
 
 
 31
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "§ 1031. Exchange of Property-Held for Productive Use or Investment
 (a) Nonrecognition of gain or loss from exchanges solely in kind. — No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.
 (b) Gain from exchanges not solely in kind. — If an exchange would be within the provisions of subsection (a) * * *, if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without their recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."
 * * * * *
 § 1031 I.R.C. of 1954, 26 U.S.C. § 1031 (1964).
 
 
 [2]
 In filing this suit Redwing was acting for itself and for Rockana Carriers, Inc. As of January 1, 1964, Rockana was merged into Redwing. For the purposes of this opinion Rockana and Redwing will be considered as one entity even though at the time the suit was brought and at the time of the transactions in question Rockana was a separate corporation which was a wholly-owned subsidiary of Redwing
 
 
 [3]
 Findings of fact by the district court are not to be reversed unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Thompson v. Campbell, 5 Cir. 1965, 353 F.2d 787; Parr v. Scofield, 5 Cir. 1951, 185 F.2d 535, 536, cert. den., 340 U.S. 951, 71 S.Ct. 571, 95 L.Ed. 686; Wood Preserving Corp. of Baltimore v. United States, 4 Cir. 1965, 347 F.2d 117, 119
 
 
 [4]
 This finding of fact was in fact substantiated by the testimony of Charles E. Mendez:
 "Q. Mr. Mendez, when you negotiated these ideals with White and General Motors Corporation for the purchase of new equipment, did you insist that they agree to take your old equipment as a part of each of these deals?
 A. Well, I was buying a certain number of trucks, and I was selling a certain number of trucks.
 Q. But as a part of the agreement to buy the new trucks, did you insist that they take these used trucks?
 A. Well, it was part of the deal. Sure.
 Q. It was part of the deal?
 A. Yes, sir."
 
 
 [5]
 We take judicial notice of the fact that General Motors Corporation is not a non-profit corporation and that it does not consciously sell and buy trucks except for the purpose of making a profit
 
 
 [6]
 In 1962 the Internal Revenue Code was amended by the addition of Section 1245, the depreciation recapture provision, to make it no longer desirable to handle transactions in this manner. In essence, Section 1245 withdraws capital gains treatment from gains on the disposition of depreciable personal property and certain other tangible property (exclusive of buildings and their structural components) to the extent that depreciation had been deducted for such property by the seller in previous years. It permits only the excess of the sales price over the original cost to be treated as a capital gain and requires that the remainder be treated as ordinary income. See Mertens, Federal Income Taxation, Code Commentary § 1245
 
 
 [7]
 As for Redwing's contention that the provisions of Section 1031 are taxpayer elective, see United States v. Vardine. 2 Cir. 1962, 305 F.2d 60, 66, where this contention was definitively answered as follows:
 "[Section] 1031 and its predecessor are mandatory, and not optional; a taxpayer cannot elect not to use them."
 
 
 [8]
 The predecessor of § 1031 in 1939 Code was § 112(b) (1). The regulation under that section is found in Regs. 19.112(b) (1)-1 (Aug. 23, 1939) and later in Regs. 118 § 39.112(b) (1)-1(b) (1953)
 
 
 [9]
 Carlton is distinguishable on one ground other than those which have been previously discussed. Carlton involved the taxpayer's, not the Commissioner's, contention that documentary form was irrelevant in light of the "substance" of the transaction. In such circumstances the Commissioner's evidentiary problems became paramount because of the lack of insider information to prove or disprove true "substance." Moreover, since "substance" considerations can often be viewed effectively only from hindsight, the neglect of "form" could engender post-transactional tax planning on the part of many taxpayers. On the other hand, when as here the taxpayer insists that we abide by his forms and the Commissioner attempts to convince us otherwise, there is little danger, should we reject form, of our having been misled by insider reconstruction of a transaction after its effects have been determined. We, therefore, read Carlton as teaching that although a taxpayer's own documents are not conclusive, they normally override any conflicting subjective considerations advanced by that taxpayer.
 Especially, in light of the above distinction, we see no need in comparing Carlton with preceding cases through obiter dicta for a determination of whether the vital missing ingredient there was (1) the lack per se of a two-party exchange of ownership rights in like property or merely (2) the failure of the cash transfer to be contractually intertwined to the immediate purchase of like property.