Frank S. McGee, Jr., and Madeline M. McGee, et al., [1] v. Commissioner. McGee v. Comm'r
Docket Nos. 5864-66 - 5868-66. United States Tax Court
T.C. Memo 1970-251; 1970 Tax Ct. Memo LEXIS 103; 29 T.C.M. (CCH) 1106; T.C.M. (RIA) 70251; 37 Oil & Gas Rep. 640; September 2, 1970, Filed *103 B and B acquired and exercised an option on gas producing properties and thereafter assigned it to York in consideration of York's assumption of all of their obligations under the exercised option. York then agreed by contract to assign to B and B the working interest, subject to a retained production payment, in consideration of their payment of the purchase price and related expenses. B and B assigned a three-fourths interest in the contract to Alamo in consideration to cover their obligations under the York contract. Held, short-term capital gain was realized as a result of B and B's assignment to Alamo; the nonrecognition provisions of sec. 721, I.R.C. 1954, do not apply, because B and B did not contribute property to the joint venture and they acquired beneficial interests in the property itself, rather than merely an interest in the joint venture; Held, further, B and B were acting on behalf of all the petitioners in the foregoing transaction and, consequently, are taxable only on their fractional interests in the gain; Held, further, petitioners are not entitled to deduct any part of the depletion attributable to Alamo's subsequent sale of a production payment carved out of *104 its interest in the properties. Leland E. Fiske, 1800 First Nat'l Bank Bldg., Dallas, Tex., for the petitioners. D. Ronald Morello, for the respondent. FEATHERSTOR Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Docket Number
Petitioners
Year
Deficiency
5864-66
Frank S. McGee, Jr., and Madeline M. McGee
1961
$ 2,625.65
1962
133.71
5865-66
W. C. Bednar and Frances Bednar
1961
34,050.57
1962
2,013.29
5866-66
David K. Fagin and Margaret H. Fagin
1961
1,347.49
1962
109.62
1963
18.46
5867-66
Tommy M. Tucker
1961
721.64
1962
43.93
5868-66
Hugh M. Briggs and Christine V. Briggs
1961
20,062.12
Certain issues have been settled; those remaining for decision are the following: (1) Whether petitioners realized taxable income in 1961 as a result of their acquisition of interests in certain oil and gas properties; alternatively, whether petitioners realized short-term capital gain as a result of their assignment of a portion of their interest in such oil and gas properties; (2) If the transaction involving the oil and gas properties resulted in taxable income, whether the income was realized only by Bednar and Briggs or, in part, by the other *105 petitioners; and (3) Whether claimed deductions for percentage depletion in excess of cost, resulting from the sale by Alamo Petroleum Company in 1962 of a $200,000 carved out production payment, are allowable to petitioners. Findings of Fact All petitioners in these consolidated proceedings were legal residents of Dallas, Texas, at the time they filed their petitions. Frank S. McGee, Jr., and wife, Madeline M., and W. C. Bednar and wife, Frances, filed joint income tax returns for 1961 and 1962; David K. Fagin and wife, Margaret H., filed joint returns for 1961, 1962, and 1963; Tommy M. Tucker filed individual returns for 1961 and 1962; and Hugh M. Briggs and wife, Christine V., filed a joint return for 1961. All of these returns were filed with the district director of internal revenue, Dallas, Texas. During 1960 McGee, an employee of Lone Star Gas Company, learned that Phillips Petroleum Company (hereinafter referredn to as Phillips) was willing to sell certain producing oil and gas properties which it owned in Rusk County, Texas, for approximately $2,000,000. McGee conveyed this information to Bednar and Briggs, who were petroleum engineers, and was paid a commission of $10,000. *106 Bednar and Briggs decided that the properties would be a good buy at the price Phillips was asking, and engaged a law firm to promote the purchase. Since it appeared that Phillips would want to sell the properties for cash, without retaining a 1108 production payment, Bednar and Briggs decided that a corporation (which could secure a production payment loan more easily than an individual) was necessary to effectuate the purchase. The members of the law firm owned all of the stock of The Dallas Corporation (hereinafter Dallas), and on November 18, 1960, caused Dallas (as nominee of Bednar and Briggs) to pay $5,000 for an option, effective until February 1, 1961, to buy the Phillips properties for a cash consideration of $2,266,000 (subject to certain specified adjustments), with Dallas to receive credit on the purchase price for the $5,000 paid for the option. The $5,000 was advanced to Dallas by Briggs. Dallas had no income during 1960 and 1961. Bednar and Briggs then began a search for capital to finance the purchase. They conferred with the officers of New York and Honduras Rosario Mining Company (hereinafter Honduras) who agreed to participate in the acquisition through a subsidiary, *107 Alamo Petroleum Company (hereinafter Alamo). The officers of Honduras brought the officers of a New York bank into the arrangement, and they agreed to furnish funds through York Oil Corporation (hereinafter York). On January 19, 1961, Dallas gave notice to Phillips that it was exercising the option. Then, by an agreement entered into on January 26, 1961, Dallas sold the exercised option to York in consideration of York's agreement, among other things, to reimburse it for the $5,000 paid to Phillips and for all legal fees and expenses incurred in connection with the option and to assume Dallas' obligations to Phillips. The next day, on January 27, York, which did not have the facilities to operate the properties, entered into an agreement with Bednar and Briggs (hereinafter the York contract) to sell them the properties to be acquired under the option for a purchase price of $234,000 (subject to adjustment for any variation between the sum of $2,234,000 and the amount actually paid to Phillips for the properties), York retaining a production payment of $2,000,000, payable out of 95 percent of the gross proceeds from the sale of the oil and gas produced from such properties. The production *108 payment bore interest at the rate of 6 percent on the unpaid balance. In addition, Bednar and Briggs agreed to pay all of the legal and other expenses of the acquisition, financing, and transfer of the properties, and agreed to operate the properties subject to the production payment. Bednar's and Briggs' rights under this contract were not assignable without the written consent of York. By letter of January 30, 1961, York consented to the assignment by Bednar and Briggs of an undivided 75 percent interest in the York contract to Alamo. On the same day the board of directors of Alamo authorized that corporation to purchase the 75 precent interest in the properties and to enter into a joint venture agreement with Bednar and Briggs. The joint venture, Rosario Production Company (hereinafter Rosario), was formed by Bednar, Briggs, and Alamo on the following day, January 31, 1961, to "coordinate the property rights owned by [Bednar and Briggs in the Phillips properties] and the funds of Alamo, * * *, in connection with the acquisition" of the properties and to account for the operation thereof. Pertinent provisions of the joint venture agreement, in which Bednar and Briggs are referred *109 to as "Managers" and Rosario as the "Company," are as follows: 2. Contributions. Managers do hereby contribute to the Company their right, title and interest in and to that certain agreement between them and York * * *, dated January 27, 1961 (hereinafter called the "Purchase Agreement") whereby Managers have the right to acquire the oil, gas and other mineral properties and interests * * *. Alamo does hereby agree to contribute to the Company all sums necessary to acquire such oil, gas and other mineral properties and interests. The interests to be acquired in and to said oil, gas and other mineral properties under and pursuant to the Purchase Agreement are hereinafter collectively called the "Properties." 3. Conduct of Operations. Subject to the provisions hereof, the Company shall operate the Properties for the mutual benefit of the parties hereto. Legal title to the Properties shall not vest in the Company, however, but shall be and remain in Managers, their heirs, representatives and assigns, as to 12 1/2% each, and in Alamo, its successors and assigns, as to 75% thereof. Managers are hereby designated and appointed to manage the affairs of the Company for the purpose of operating *110 the Properties. * * * [Neither] of Managers shall be entitled to any compensation for services rendered hereunder. * * * Notwithstanding anything expressed pressed or implied in this Agreement, any party hereto may sell or otherwise dispose of, or encumber by mortgage, pledge or 1109 otherwise, all or any part of his interest in the Properties and the production therefrom. 4. Disposition of Production. Each party hereto shall have the right to receive in kind and to separately dispose of his or its proportionate share of the production from the Properties. Each party shall execute all gas sales contracts, processing agreements, division orders, transfer and division orders or other instruments pertaining to the sale or other disposition of his or its share of such production. Each party shall cause all proceeds and revenues attributable to the sale or other disposition of his or its share of such production to be deposited in the general account of the Company and to be used or distributed, all as provided in Section 5 hereof. Any extra expense incurred in delivering his or its proportionate part of the production to any one party shall be borne by such party. In the event any party *111 hereto shall fail to make the necessary arrangements to take in kind or separately dispose of such party's proportionate share of the production from the Properties, either of Managers shall have the right on behalf of the Company, subject to revocation at will by the party owning the same, to purchase such production or sell the same to others for the time being at not less than the market price prevailing in the area and not less than the price Managers receive for their proportionate part of such production, and any such purchase or sale shall be subject always to the right of the owner of such production to exercise, at any time, all its right to take in kind or separately dispose of his or its share of such production not previously delivered to the purchaser pursuant hereto. 5. Accounts of the Company. * * * There shall be deposited to * * * accounts of the Company all revenues and proceeds received from the sale or other disposition of production attributable to the Properties, including any revenues and proceeds from production received by any party directly * * *. 8. Ownership of Properties and Related Items. The parties shall own the Properties and all materials and supplies *112 used or obtained in connection therewith, together with all production therefrom and all items of income and deduction or loss relating thereto in the following proportions: W. C. Bednar
12 1/2%
Hugh M. Briggs
12 1/2%
Alamo Petroleum Company
75 % * * * 10. Term of Agreement. This agreement shall be effective from the date hereof and shall continue in full force and effect until the earlier to occur of (i) the death of Managers or (ii) the exhaustion of production from the Properties. * * * No provision hereof shall prohibit or limit the right of any party to sell or otherwise dispose of, or encumber, his interest in the Properties or the production therefrom but, subject to the terms above provided in this Section, this agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, successors, representatives and assigns. 11. Payment of Special Expenses. Except for the costs and expenses in connection with the acquisition of the Properties which are to be contributed by Alamo as provided in Section 2 above, all costs and expenses thereafter incurred by the Company for the primary benefit of all parties hereto shall be borne proportionately by all *113 parties. However, upon the acquisition and commencement of operation of the Properties any costs and expenses thereafter incurred for the primary benefit of less than all of the parties hereto, including, but not limited to, examinations, reports and valuations, shall be paid by the party or parties requesting the same or for whose primary benefit such costs and expenses shall have been incurred. * * * 13. Construction of Agreement. Neither this Agreement nor any operation or activity hereunder shall constitute or be deemed to be a partnership or association and the liabilities and obligations of each party hereto shall be several and not joint or collective, limited as to each party to his or its proportionate interest in the Properties. On February 24, 1961, Alamo paid $309,331.04 to York as the total price agreed upon under the York contract for the purchase of the working interest in the Phillips properties. This was the total amount paid by Alamo for its undivided interest in the oil and gas properties. Included in this payment were $5,000 to reimburse Dallas for the consideration paid for the option and $10,000 to reimburse Briggs for the commission paid McGee. On the same date, *114 York remitted the sum of $2,258,086.36 to Phillips in full payment of the purchase price for the properties (the total price of $2,263,086.36 reduced by the $5,000 previously paid for the option); Phillips executed an assignment of the properties to York; and York assigned interests in the properties, subject to $2,000,000 retained production payment, as follows: to Alamo a 75 percent interest, to Briggs a 1110 12 1/2 percent interest, and to Bednar a 12 1/2 percent interest. Throughout all of the foregoing transactions Bednar and Briggs were acting not only for themselves, but also for Fagin, Tucker, and McGee. These arrangements were formally reflected in participation agreements executed on February 1, 1961, which established these parties' respective ownership of Bednar's and Briggs' interests in the properties and Rosario as follows: Owner
Interest
Bednar
85% of 12 1/2%
Fagin
10% of 12 1/2%
Tucker
5% of 12 1/2%
Briggs
87 1/2% of 12 1/2%
McGee
12 1/2% of 12 1/2% The interests of Fagin, a petroleum engineer employed by Bednar's engineering consulting firm, and Tucker, Bednar's secretary and bookkeeper, were evidenced by participation agreements executed by Bednar; McGee's interest was evidenced *115 by a participation agreement executed by Briggs. All three agreements are identical except for differences in the names and percentages. Pertinent provisions of the participation agreement between Briggs and McGee (referred to therein as "Participant") follow: WHEREAS, the following facts exist: 1. Briggs and Participant acquired through Briggs the right to an undivided interest in [the Phillips Properties] * * *; * * * 4. Participant actually owns an undivided 12.5 percentage of Briggs' interest in the [Phillips] Properties and the [Rosario] Joint Venture Agreement, and the parties desire to evidence the same hereby as hereinafter described. NOW, THEREFORE, in consideration of the premises and Ten ($10.00) Dollars and other good and valuable consideration paid by Participant to Briggs, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby acknowledge and agree that Participant owns and is entitled to an undivided 12.5% interest in, to and under the interest of Briggs in the Properties and the Joint Venture Agreement, subject as hereinafter provided. It is also understood and agreed that the ownership and interest of Briggs in the Properties and the Joint *116 Venture Agreement is owned and held by him subject to the right, title and interest of Participant hereunder to the extent of the aforesaid percentage of Participant therein; provided, however, that Briggs shall continue as the named party in the Rosario Joint Venture Agreement and in all matters therein and thereunder and in connection with the Properties. During 1961 none of the petitioners was an officer, director, or stockholder of Phillips, Dallas, York, or Alamo. The value of the Phillips properties on February 24, 1961, the date on which they were acquired by Alamo, Bednar, and Briggs, was $412,441.39 (a sum equal to 4/3 the amount paid by Alamo to York), of which amount $240,000 represented the value of the leasehold equipment on the properties (the cost of which is returnable through deductions for depreciation) and the balance, $172,441.39, represented the value of the leaseholds (the cost of which is returnable through deductions for depletion). For the computation of allowable cost depletion and depreciation for 1961, 1962, and 1963, the total basis of the properties on February 24, 1961, is to be allocated between depreciable and depletable property in the proportions *117 of 240,000/412,441.39 and 172,441.39/412,441.39, respectively. Finally, cost depletion and depreciation on these allocated amounts for 1961, 1962, and 1963, shall be computed by using the same rates, based on the percent of gas produced each year, that were used by respondent in the notices of deficiency. The properties acquired from Phillips were operated during 1961, 1962, and 1963 by Rosario, which accounted for the income and expenses incurred in connection with such operation on partnership returns filed for those calendar years. The income from the properties, attributable to Bednar, Fagin, and Tucker, was reported on partnership returns in which the partnership was designated as "W. C. Bednar et al." Rosario's partnership returns for 1961 and 1963, and its amended return for 1962, reported the following operating results, computed with the indicated depletion deductions: Year
Ordinary Income(Loss)
Depletion Deduction
1961
($71,392.59)
$ 2,387.15
1962
76,905.37
64,487.70
1963
320,704.57
157,977.41 In 1962 Alamo sold a $200,000 production payment out of its 75 percent interest in the oil and gas properties. On Rosario's amended partnership return for 1962, "Depletion in Excess of Amount *118 Per Books" was allocated to the respective property owners as follows: 1111 Alamo
$59,739.88
W. C. Bednar, et al
1,375.99
Briggs 1,375.99
Total Excess Depletion
$62,491.86 This allocation of excess depletion results in the allocation of income on the return as follows: Alamo
$94,808.05
W. C. Bednar, et al
(8,951.34)
Briggs (8,951.34)
Total Income
$76,905.37
In the notices of deficiency respondent determined that each of the petitioners realized unreported ordinary income in 1961 in the form of interests in the Phillips Petroleum Company oil and gas properties as follows: Peti- tioners
Income Determined toHave Been Unreported
McGee
$ 6,444.40
Bednar
51,555.18
Fagin
5,155.52
Tucker
2,577.76
Briggs
51,555.18 In making these determinations, the amount shown for McGee was included also in the determination for Briggs; similarly, the amounts shown for Fagin and Tucker were included in the determination for Bednar. Respondent further determined that petitioners overstated their partnership losses for 1961 and understated their partnership income for 1962 and 1963 as follows: Peti- tioners
1961
1962
1963
McGee
$ 968.37
$ 598.94
Bednar
6,584
4,072.79
Fagin
774.70
479.15
$68.92
Tucker
387.35
239.58
Briggs
6,833.93
Opinion Issue 1. *119 Acquisition of an interest in the Phillips properties At the end of the series of transactions detailed in our Findings, Bednar and Briggs and their associates [2] had acquired title to a 25 percent interest in the valuable gasproducing Phillips properties without any outlay whatever of cash or credit. They contend, nevertheless, that they incured no income tax on the resulting increase in their wealth. Their explanation is that they contributed their rights under their York purchase contract to Rosario, the joint venture, in exchange for a 25 percent interest therein, thus bringing the transaction within the following nonrecognition provisions of section 721: No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership. Respondent takes an entirely different view of the tax consequences of these transactions. He argues, *120 first, that petitioners received their interests as finder's fees, commissions, or compensation for negotiating the acquisition of the properties. Alternatively, he contends that the exchange by petitioners of their contract rights for a 25 percent interest in the properties resulted in the realization of short-term capital gains, measured by the fair market value of the interests acquired. A brief summary of the essential facts will aid the analysis. Bednar and Briggs learned that the Phillips properties could be bought for a favorable price. Dallas, a corporation owned by a law firm which Bednar and Briggs had consulted, acquired an option on the properties as their nominee. Bednar and Briggs then set about working out an arrangement known in the oil and gas parlance as an ABC transaction [3] *122 in order to obtain needed capital and, in Bednar's words, "to avoid having any personal income." After Bednar and Briggs had brought York and Alamo into the deal, the following steps were taken in rapid succession. Dallas exercised the option on January 19 and a week later transferred the exercised option to York, a corporation with cash to invest but neither personnel nor facilities for operating *121 the properties. The next day York contracted to sell the properties to Bednar and Briggs, subject to a retained production payment of $2,000,000 (plus interest). The price which Bednar and Briggs were to pay York was only about three-fourths of the fair market value of the properties, adjusted for York's retained production payment. Four days later Bednar and Briggs, instead of carrying out their agreement with York, entered into 1112 the Rosario joint venture agreement with Alamo, pursuant to which they assert they contributed to Rosario their rights under the York contract, and Alamo contributed a sum equal to the purchase price under the York contract. In exchange for the respective contract. In exchange for the respective contributions, petitioners maintain they received a cost-free, tax-free 25 percent interest in the joint venture (i.e., a partnership [4] *123 ); and Alamo received a 75 percent interest therein. Petitioners assert that this last step in the series of transactions brings them within the nonrecognition of gain provisions of section 721. Respondent's argument that the fair market value of petitioners' share of the working interest is taxable as a finder's fee, commission, or some other form of compensation is without merit. Petitioners acquired the option on the Phillips properties through Dallas, their Nominee, before they had worked out any of the arrangements with Alamo and York; in making this acquisition through Dallas they represented only themselves. Potential gain was built into the option and the eventual York purchase contract because they provided for a bargain purchase. [5] *124 It was this inherent profit that petitioners received rather than compensation from either Alamo or York for arranging the acquisitions. The participation of Alamo and York was necessary for petitioners to realize the inherent profit in the contracts - those parties provided the needed capital. We think respondent is correct, however, that petitioners realized short-term capital gain in the transaction. Taking the transaction as cast by the parties, [6] under their contract with York, petitioners were entitled (and obligated) to acquire the entire Phillips properties (less York's production payment). Instead of doing this, they sold a 75 percent interest in the contract to Alamo, and Alamo agreed to pay on behalf of petitioners and itself an amount equal to the purchase price of the entire working interest. Thereafter, petitioners continued to hold a 25 percent interest in the contract and, on completion of the York contract, acquired ownership of a similar undivided percentage of the working interest. Thus, within the meaning of section 1222(1), they realized short-term capital gain measured by the difference between their basis for the 75 percent interest and the amount paid *125 by Alamo. Section 721, which applies only in the case of the "contribution of property * * * in exchange for an interest in the partnership," does not stand in the way of the recognition of petitioners' gain for two reasons. First, petitioners did not make a contribution of property, i. e., their interest in the York contract or any other property, to Rosario. True, paragraph 2 of the Rosario joint venture agreement states that they "do hereby contribute" the York contract. *126 But paragraph 1 of the agreement shows that Rosario was to be used only as a tool - "to coordinate * * * the acquisition" of the properties by petitioners and Alamo as co-tenants. More 1113 accurately, the agreement only recites that Rosario was to have been so used: The facts are that Bednar and Briggs, with York's formal consent, assigned an undivided interest in the York contract directly to Alamo; Alamo paid the purchase price directly to York; and York transferred legal title, without any restrictions, directly to Alamo and Bednar and Briggs. [7] *127 Second, from the joint venture agreement, quoted in material part in our Findings, it is abundantly clear that beneficial ownership of the working interest was vested in the parties, not in Rosario; thus, the gain in question is not represented by "an interest in the partnership" within the meaning of section 721. Paragraph 2 recites that the properties were to be acquired under and pursuant to the purchase agreement, and the purchase agreement says nothing about Rosario. Paragraph 3 provides that legal title is to vest in the parties, and contains no suggestion that equitable ownership is to be placed in the joint venture; it also confers various powers on Bednar and Briggs to operate the properties for the "mutual benefit" of the parties but ends with the following provision: Notwithstanding anything expressed *128 or implied in this Agreement, any party hereto may sell or otherwise dispose of, or encumber by mortgage, pledge or otherwise, all or any part of his interest in the Properties and the production therefrom. By paragraph 4, each party is given the right to receive and separately dispose of his share of the production in kind and is to "execute all gas sales contracts, processing agreements, division orders, transfer and division orders or other instruments pertaining to the sale or other disposition of his or its share of such production." Any arrangement made through the joint venture for disposition of a party's share of the production from the properties is subject to revocation at will. While there are provisions for the deposit of the proceeds of sales of production in a joint venture account, the payment of expenses from the account, and the monthly distribution of the remainder to the parties, these provisions are not inconsistent with the parties' beneficial ownership of the working interest, [8] indeed, these provisions when viewed together with the individual rights to the oil and gas produced demonstrate that the agreement does not call for a sharing of profits and losses *129 but for each party to receive the income from the sale of his individual share of the production with only the joint costs of operations being shared. [9]
In arriving at our conclusion that section 721 does not apply, we have considered and rejected petitioners' contention that, because the properties were to be managed by Bednar and Briggs for the "mutual benefit" of the parties, equitable title vested in Rosario. Under Texas law the intent of the parties, gleaned from the agreement and all the pertinent circumstances, determines whether property is beneficially owned by a partnership or by the partners *130 individually. Logan v. Logan, 138 Tex. 40, 48-49, 156 S.W. 2d 507, 512 (1941). This is true even where the partnership's business consists solely of operating the individually owned property. Littleton v. Littleton, 341 S.W. 2d 484, 489 (Tex. Civ. App. 1960). This rule of state law is consistent with the rule for tax purposes. See sec. 1.707-1(a), Income Tax Regs. We think it clear that petitioners intended to retain beneficial ownership individually. Similarly rejected is the idea, implicit in petitioners' arguments, that because coownership and joint operation of mining properties create a mining partnership by operation of law, Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W. 2d 10521114 (1929), the properties are owned by the partnership. A condition precedent to the creation of such a partnership is that the partners be co-owners of the property. Also, in mining partnerships each partner has freedom to transfer his undivided interest without terminating the partnership.[10]Munsey v. Mills & Garitty, 115 Tex. 469, 283 S.W. 754 (1926); Lee Jones, Jr., "Mining Partnerships in Texas," 12 Tex. L. Rev. 410 (1934), Oil and Gas Law, Vol. 1, 517. These facts presuppose that the partners *131 individually own the mining interests. Consistent with the state law rule, the 1954 Code goes far towards treating the joint operations of mining properties as partnerships for income tax purposes, but implicitly recognizes that the parties have beneficial ownership of the properties. Thus section 1.761-1(a)(2)(iii), Income Tax Regs., states: Operating agreements. Where the participants in the joint production, extraction, or use of property - (a) Own the property as co-owners, either in fee or under lease or *132 other form of contract granting exclusive operating rights, and (b) Reserve the right separately to take in kind or dispose of their shares of any property produced, extracted, or used, and (c) Do not jointly sell services or the property produced or extracted, * * * then such group may be excluded from the application of the provisions of subchapter K * * *. Inherent in this right of the joint operators to elect to be excluded from the application of subchapter K is a recognition that they individually own the property as co-owners even though their relationship may constitute a partnership for certain purposes. See also sec. 1.704-1 (c)(3), Example (3), Income Tax Regs. In summary, we think it quite clear that petitioners did not in fact contribute their York contract to Rosario in exchange for an interest in the joint venture. Other than purporting to serve as a vehicle for coordinating the acquisition of the properties, Rosario's function was merely to operate the properties for the co-owners.[11] In substance petitioners sold a 75 percent interest in their York contract for a sum sufficient to cover the entire purchase price. Respondent has erred, however, in allowing no adjustment *133 for petitioners' adjusted basis. See Crane v. Commissioner, 331 U.S. 1 (1947). Petitioners' gain is measured by the difference between 75 percent of their obligations under the York contract (i. e., .75 x $309,331.04 = $231,997.28) and the amount of the price paid by Alamo (i. e., $309,331.04); the total gain is $77,333.76. Issue 2. Taxability of gain to petitioners other than Bednar and Briggs Bednar testified that he represented himself, Fagin, and Tucker and that Briggs represented himself and McGee in acquiring the Phillips properties. Fagin and Tucker were employees of Briggs; McGee gave Bednar and Briggs the information that the properties were for sale. Bednar's testimony is corroborated by his and Briggs' execution of the participation agreements on February 1, 1961. The parties have stipulated: Ownership of said gas properties *134 which were originally assigned to Bednar and Briggs and which were operated by Rosario Production Company is as follows: W. C. Bednar
85 % of 12 1/2%
David K. Fagin
10 % of 12 1/2%
Tommy M. Tucker
5 % of 12 1/2%
Hugh M. Briggs
87 1/2% of 12 1/2%
Frank S. McGee, Jr
12 1/2% of 12 1/2% In the light of these facts, we hold that Bednar and Briggs are not taxable on all the gain realized on the transaction but are taxable in the respective proportions of their ownership of the properties set forth in the stipulation. Issue 3. Depletion allowance The parties have stipulated that "In 1962, Alamo Petroleum Company sold a $200,000 1115 production payment out of its 75 percent interest in the oil and gas properties." Under Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958), the proceeds of this sale of a carved out production payment are treated as receipts from the advance sale of gas and thus are taxable as ordinary income subject to depletion. The question is whether petitioners are entitled to share the depletion deduction attributable to this sale. Petitioners contend that under the Rosario agreement they are entitled to share in the excess of percentage over cost depletion; respondent contends *135 that since the $200,000 production payment was carved from Alamo's fractional interest, petitioner is not entitled to any depletion deduction with respect thereto. From what we have said above in connection with Issue 1 follows the conclusion that respondent's position is correct. The theory of the depletion deduction allowed by sections 611 and 613 is that the extraction of the minerals gradually exhausts the capital investment in the mineral deposit, Commissioner v. Southwest Expl. Co., 350 U.S. 308, 312 (1956); the purpose of the deduction is "to permit the owner of a capital interest in mineral in place to make a tax-free recovery of that depleting capital asset." Parsons v. Smith, 359 U.S. 215, 220 (1959). Since Alamo was the beneficial owner of the 75 percent share of the working interest from which the production payment was carved, petitioners are not entitled to the disputed deduction. We do not think section 704(a) [12] aids petitioners' claim to the disputed deduction. That section lays down the general rule that a partner's distributive share of a deduction is to be determined by the partnership agreement. Under the partnership agreement as it stood during 1962, each party *136 was entitled to deduct the depletion attributable to his respective interest. While Bednar testified that petitioners agreed with Alamo prior to April 15, 1963, that the parties would share in the depletion in respect of the carved out production payment, we do not think that their agreement can be given effect. The stipulated fact is that Alamo, not the joint venture or petitioners, made the sale of the carved out production payment; thus Alamo's, not the joint venture's or petitioners', capital investment in the economic interest was depleted by the sale. [13] *137 Partners, merely because they are partners, cannot by agreement divide a depletion deduction to which one of them is entitled with respect to his individually owned property. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: W. C. Bednar and Frances Bednar, docket No. 5865-66; David K Fagin and Margaret H. Fagin, docket No. 5866-66; Tommy M. Tucker, docket No. 5867-66; and Hugh M. Briggs and Christine V. Briggs, docket No. 5868-66.↩
2. Bednar and Briggs were at all relevant times representing Fagin, Tucker, and McGee, as well as themselves. Unless the context indicates otherwise, the terms "Bednar and Briggs" as well as "petitioners" will hereafter refer to all of these parties.↩
3. In a typical ABC transaction, A sells producing oil and gas leases to B for a cash consideration, and retains a production payment. Simultaneously A sells the production payment to C for cash. The present transaction was a variation of this type of transaction in that Phillips (A) sold the entire leases to York (C), which retained the production payment and sold the working interest to Bednar and Briggs (and Alamo) (B). 4. SEC. 761. TERMS DEFINED (a) Partnership. - For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. Under regulations the Secretary or his delegate may, at the election of all the members of an unincorporated organization, exclude such organization from the application of all or part of this subchapter, if it is availed of - (1) for investment purposes only and not for the active conduct of a business, or (2) for the joint production, extraction, or use of property, but not for the purpose of selling services or property produced or extracted, if the income of the members of the organization may be adequately determined without the computation of partnership taxable income. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
5. No gain is realized, of course, from a bargain purchase negotiated at arm's-length. See Palmer v. Commissioner, 302 U.S. 63, 68-69 (1937); Fred Pellar, 25 T.C. 299 (1955). Gain or loss may be realized, however, from the sale, exchange, or failure to exercise an option. See. 1234(a); see generally Miller v. Commissioner, 295 F. 2d 538 (C.A. 8, 1961), affirming a Memorandum Opinion of this Court; 24,166(M)]; Barber v. United States, 215 F. 2d 663 (C.A. 8, 1954), certiorari denied 348 U.S. 897↩ (1954).
6. The evidence shows quite clearly that the entire transaction from the exercise of the option by Dallas to petitioners' receipt of title to their 25 percent share of the working interest was planned and carried out to achieve a preconceived objective. Accordingly, it may be argued that all the intermediate steps should be ignored and the transaction viewed as a sale by petitioners of all the phillips properties except 25 percent of the working interest (less York's production payment). See, e. g., Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938); Redwing Carriers, Inc. v. Tomlinson, 399 F. 2d 652↩ (C.A. 5, 1968), and cases cited. But the same tax result flows from the transaction in the form cast by the parties.
7. Even if effect is given to the recitation in the joint venture agreement that petitioners contributed their York purchase contract to Rosario, the effect of the subsequent provisions of the agreement, as discussed below, was to vest beneficial ownership of, as well as title to, the working interest in Alamo and petitioners. Such vesting would constitute a distribution and would call for a step transaction analysis as required by the following provisions of sec. 1.731-1(c)(3), Income Tax Regs.: If there is a contribution of property to a partnership and within a short period: * * * (ii) After such contribution the contributed property is distributed to another partner, such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner. Such a transaction shall be treated as an exchange of property.
8. Bednar testified: This almost had to be a joint venture because the Phillips Petroleum Company had signed a 100 per cent division order with Lone Star Gas and with the Permian Corporation for the sale of the products and there wasn't any way that one working interest owner could take on the responsibility of keeping up with the title on twelve 640-acre East Texas tracts, eleven of which were producing with some 780 to 900 different checks to be written every month, and three sources of income to be kept up with. ↩
9. See paragraph 11 of the joint venture agreement quoted in our Findings.↩
10. The provision in paragraph 10 of the joint venture agreement that "this Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, successors, representatives and assigns" does not significantly qualify petitioners' ownership rights. In a mining partnership, one of the partners may sell his interest to a third person without the consent of his co-partner and the third party becomes a member of the partnership; the profits follow the property and the right to sell grows out of the necessity for continued working of the mine in order that it may be profitable. Munsey v. Mills & Garitty, 115 Tex. 469, 283 S.W. 754, 759-760↩ (1926).
11. Section 707(a) recognizes that an individual may deal with a partnership of which he is a member, specifying that such a transaction shall "be considered as occurring between the partnership and one who is not a partner." Such transactions may include "the rendering of services by the partnership to the partner." Sec. 1.707-1(a), Income Tax Regs.↩
12. SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. (a) Effect of Partnership Agreement. - A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement. ↩
13. Indeed, even the amended partnership return shows that all the proceeds of the sale of the $200,000 production payment were distributed to Alamo, thus demonstrating that Alamo's capital investment, not that of petitioners, was depleted and supporting our conclusion on Issue 1 that the parties, not Rosario, beneficially owned their respective interests in the properties.